# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA'SANE ROBERTSON,<br><br>      Petitioner,<br><br>    v.<br><br>MATTHEW CATE, Secretary of CDCR,<br><br>      Respondent. | No. CV 12-633-GW (PLA)<br><br>**ORDER ACCEPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

On May 28, 2019, the United States Magistrate Judge issued a Report and Recommendation ("Report"), recommending that petitioner's Petition for Writ of Habeas Corpus be denied and that this action be dismissed with prejudice. (Docket No. 147). On July 9, 2019, petitioner, who is represented by the Federal Public Defender's Office, filed Objections to the Report (alternatively "Obj."), which includes an Application for a Certificate of Appealability. (Docket No. 151).

Several of the arguments that petitioner makes in his Objections are sufficiently addressed in the Report. Some of his arguments, however, warrant further discussion. Each of those arguments is addressed in turn below.

    **A.    Evidence of Petitioner's Mental Impairments**

In his Objections, petitioner asserts that all evidence of petitioner's purported long-term mental impairments was dismissed simply because that evidence was generated before or after

petitioner's 2002 guilty plea. (See, e.g., Obj. at 7 ("The Report wrongly dismisses evidence of [petitioner's] long-term impairments and illnesses simply because it is not contemporaneous with his 2002 guilty plea. . . ."), 8). According to petitioner, it was error to "dismiss" this evidence because Supreme Court and Ninth Circuit precedent holds that competency claims, such as the one asserted by petitioner, can be evaluated using new evidence. (Id. (citing Moore v. Texas, __ U.S. __, 137 S. Ct. 1039, 197 L. Ed. 2d 416 (2017); Hall v. Florida, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014); Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir. 2001)).

      This objection is not well-taken. The clear implication of petitioner's argument is that any evidence that was not contemporaneous with petitioner's 2002 plea hearing was not considered. (See Obj. at 8 ("The Report cites no authority holding that a habeas court is limited to considering contemporaneous evidence when assessing a defendant's competency to stand trial.")). On the contrary, however, each piece of evidence that petitioner submitted in support of his competency claim was carefully considered and evaluated. (See Report at 19-28, 30). In doing so, the Magistrate Judge summarized each piece of evidence and explained why it did not show that petitioner was incompetent to stand trial or plead guilty. (Id.). While it was acknowledged in the Report that much of the evidence was not contemporaneous with the 2002 hearing, the evidence was not rejected for that reason alone. Rather, that reason was but one of several reasons that were cited as explanation for why the evidence was insufficient to show petitioner's incompetence to plead guilty in June of 2002. (See, e.g., id. at 20-21 (explaining that 2002 medical records post-dating entry of plea did not show incompetence because they were generated after petitioner was incarcerated, they conflicted with evidence pre-dating plea, and because symptoms described in post-plea records did not continue); id. at 21-22 (explaining that petitioner's 2005 incompetency diagnosis did not show that petitioner was incompetent in 2002 because diagnosis was generated three years after plea hearing and coincided with petitioner facing life in prison for unrelated crime and because petitioner was subsequently found to be malingering).

/
/
/

### B. Petitioner's Monosyllabic Responses at His Plea Hearing

Petitioner also asserts error due to the alleged "emphasi[s]" on court transcripts that reflected his monosyllabic responses to questions asked of him at his plea hearing because those monosyllabic answers constitute "weak evidence" of his competency in 2002. (Obj. at 10). This is so, according to petitioner, because reliance on those answers ignores the very real possibility that petitioner's answers "mask[ed]" the fact that he was "simply following the cues given to him by the trial court and his counsel." (Id.).

This objection is not well-taken. The Court agrees that the Report discussed petitioner's "monosyllabic responses" to the questions posed to him at the plea hearing. (See Report at 13, 16). This discussion, however, was warranted because petitioner himself raised the issue of his monosyllabic answers in arguing that the record *reflects* that he was incompetent to plead guilty. (See Docket No. 1 at 8 ("The sentencing hearing of petitioner's guilty plea demonstrates nothing but [m]ono-symbolic [sic] responses to all of the trial court's questions."); see also Docket No. 142 at 22 ("[Petitioner's] responses to both the prosecution and the trial court at the plea colloquy consisted of yes or no answers.")). Indeed, the Report introduced the subject of petitioner's monosyllabic responses as a way to refute *petitioner's* argument as to the importance of those answers: "Although petitioner, now, contends that his monosyllabic responses to the questions posed to him suggest that he did not understand the nature of the proceedings or the questions, he ignores the fact that, for the most part, he was posed questions requiring only a 'yes' or 'no' response." (Report at 13).

Moreover, petitioner ignores the purpose of this discussion of his answers during the plea hearing. For example, it was noted that despite petitioner's monosyllabic answers at the plea hearing, he nevertheless "answered 'yes' when appropriate and answered 'no' when appropriate." (Id. at 14). What is more, the Report also reflected that "when questioned in a way that called for something other than a 'yes' or 'no' response, petitioner, again, provided an appropriate response." (Id.).

Furthermore, petitioner's suggestions that the Magistrate Judge's analysis relied exclusively on petitioner's monosyllabic responses at the plea hearing or that too much emphasis was placed

on those answers, are belied by the Report's detailed discussion of the import of petitioner's statements at the sentencing hearing and in his post-plea hearing letter to the court. (See id. at 16-19). Indeed, petitioner's statements and arguments at the sentencing hearing were found to constitute the strongest evidence of petitioner's competency: "Assuming the existence of any doubt as to his ability to understand the nature and consequences of his guilty plea, petitioner's statements at his sentencing hearing eliminated any such doubt." (Id. at 17). In particular, the Magistrate Judge noted that "at the subsequent sentencing hearing, where he was offered the chance to withdraw his guilty plea, petitioner spoke in complete sentences and cogently expressed his concerns about the plea agreement." (Id.). As to petitioner's post-plea hearing letter, that letter was found significant because it demonstrated petitioner's understanding of the terms of the plea arrangement and "used cogent arguments to urge the trial court to increase the number of credits for which he was eligible." (Id.). What is more, the presiding trial judge's observations and conclusions from the 2002 plea and sentencing hearings supported the Magistrate Judge's conclusion that the contemporaneous record showed petitioner's competence to plead guilty. (Id. at 19). Indeed, the Magistrate Judge accurately noted that the presiding trial judge "was not unsympathetic to the difficult choice that petitioner faced"; nevertheless, the trial judge "expressed no concerns with petitioner's competence." (Id.). And, as is clear from the summation of the evidence pertaining to petitioner's guilty plea, the conclusion that petitioner was competent to make that plea was based on the Magistrate Judge's consideration of the entirety of the evidence contemporaneous with petitioner's guilty plea:

> In short, the transcripts from the plea hearing and the sentencing hearing, along with the letter that petitioner wrote to the trial court, show that he was competent to plead guilty to the charged crimes and that his decision to do so reflected a thorough and informed consideration of the options available to him after having consulted with counsel.

(Id.).

To the extent that petitioner suggests that his one-word responses at the plea hearing should not have been considered at all, he is mistaken. The fact that petitioner acknowledged in open court that he had discussed all the relevant facts of his case with counsel and had decided to freely and voluntarily enter into the negotiated plea agreement in order to avoid additional

1   charges and a potentially longer sentence than that provided in the agreement -- whether he did
2   so in monosyllabic words or in complete sentences -- was undoubtedly relevant to whether he was
3   competent to enter his guilty plea. See Blackledge v. Allison, 431 U.S. 63, 73, 97 S. Ct. 1621, 52
4   L. Ed. 2d 136 (1977).  Although petitioner is correct that it would be error to consider *only* his
5   monosyllabic responses at the plea hearing in determining his competence to plead guilty, it is
6   clear that all of the relevant evidence was considered in reaching this conclusion.

7         For the foregoing reasons, petitioner's objection concerning the Magistrate Judge's
8   evaluation of petitioner's responses at the plea hearing is meritless.

9         **C.**      **Petitioner's Post-Conviction Mental Illness**

10        In his next objection, petitioner takes issue with the affirmative finding that any mental
11  deterioration suffered by petitioner in 2004, as well as the 2005 finding that he was incompetent
12  to stand trial, were attributable to the fact that, at that time, petitioner was facing a life sentence
13  resulting from a crime that he committed in prison. (See Obj. at 11 ("According to the Report,
14  [petitioner's] mental deterioration was caused, not by larger psychological issues, but simply by
15  'the very real possibility of being sentenced to twenty-five-years-to-life in prison for committing a
16  crime while incarcerated.'") (citing Report at 30)).  According to petitioner, it is unlikely that his
17  documented 2004 mental illness was attributable to the prospect of facing life in prison for new
18  criminal charges because, among other things, prison records show that he continued to be
19  diagnosed with psychotic symptoms (and was prescribed anti-psychotic medication) years after
20  the criminal charges were resolved. (Id. at 12 (citations omitted)).

21        This argument reflects a misreading of the Report.  No finding was made as to the cause
22  of petitioner's 2004 mental illness and then evidence of that illness disregarded on that basis.
23  Rather, a variety of reasons why the 2004 medical records and the subsequent 2005
24  incompetency finding were insufficient to show that petitioner was incompetent to plead guilty in
25  June 2002 were discussed in the Report.  For example, it was noted that the 2005 incompetency
26  finding was undermined by the fact that, in 2006, petitioner was found to have been malingering.
27  (Report at 22).  In addition, the Report noted that the 2005 incompetency finding was three years
28  removed from the 2002 plea hearing, and that before 2004 -- that is, nearly two years *after*

petitioner pleaded guilty -- petitioner had never been prescribed anti-psychotic medication. (Id. at 21). In that context, the Magistrate Judge observed that petitioner's mental health may have deteriorated after having spent years in prison. And, indeed, other than for an extremely brief period *after* beginning his prison term,[1] there are no prison records showing that, between 2002 and 2004, petitioner was diagnosed with any mental illness. These facts allowed for the possibility that petitioner's 2004 mental illness was related to the fact that, in 2004 (after having spent nearly two years in prison), he was facing criminal charges that carried a potential life sentence in prison. (See id. at 22). In making this allowance, the Magistrate Judge noted that, in June 2002, one of petitioner's primary reservations about pleading guilty was the prospect of facing a life sentence if he were to be convicted of a committing a crime while serving his sentence:

> Moreover, when petitioner was found incompetent to stand trial in June 2005, he potentially was facing dire circumstances. Indeed, at his 2002 sentencing hearing, one of the main concerns that petitioner raised about his guilty plea was the prospect of being convicted of a crime while in prison and, thereafter, being sentenced to a twenty-five-year-to-life sentence. That concern undoubtedly became more pronounced when he was charged with three counts of battery against a non-confined person. Thus, there is even more reason why his mental health would deteriorate beginning in 2004. For that reason, the status of petitioner's mental health under the circumstances he faced in 2005 sheds little, if any, light on his mental health status in June 2002.

(Id.). Although petitioner contends that petitioner's 2005 finding of incompetency was disregarded simply because petitioner was facing a life sentence, the foregoing discussion shows that contention to be false. In fact, the analysis of the 2005 incompetency finding addressed multiple issues and factors and, in the summation pertaining to petitioner's 2004 and 2005 prison records, the Report explicitly stated that "petitioner's prison records do not show that he was incompetent to plead guilty in June 2002" "for the foregoing *reasons*." (Id. (emphasis added)).

---

[1] Prison records from July 5, 2002, indicated that petitioner was suicidal, that he had been hitting his head against a wall, and that he had reported hearing voices. (See Docket No. 144-1). However, within less than two weeks, prison records showed that these symptoms had subsided. Indeed, as the Report noted, "petitioner's July 18, 2002, Reception Center Mental Health Evaluation noted that, although petitioner had a mental health history, he had no current diagnosis or symptoms, and that his current appearance, mood, cognition, orientation, judgment and attitude were all 'within normal limits.'" (Report at 21 (citing Docket No. 67)).

6

Accordingly, there is no merit to petitioner's contention that petitioner's 2005 inompetency finding (or his 2004 prison records) was rejected solely on the basis that, at the time, petitioner was facing a life sentence. There is, likewise, no merit to petitioner's contention that an affirmative finding was made as to the cause underlying petitioner's 2005 competency finding.

**D.     Dr. McDermott's Opinion of Petitioner's Intellectual Functioning**

In his next objection, petitioner maintains that the Magistrate Judge committed multiple errors in rejecting the opinion of petitioner's expert, Barbara E. McDermott, Ph.D.

**1.     The Timing of Dr. McDermott's Opinion**

First, petitioner asserts that it was error to fail to consider Dr. McDermott's opinion because it was not authored until over a decade after petitioner entered his guilty plea, because courts are permitted to (and, in fact, should) consider "non-contemporaneous evidence when assessing competency." (Obj. at 13-14).

This argument is meritless. Indeed, the Report explicitly states that Dr. McDermott's opinion was *not* rejected solely based on the fact that it was not authored contemporaneously with petitioner's guilty plea:

> The Court does not reject Dr. McDermott's report simply because it was generated over a decade after petitioner pleaded guilty. Rather, the Court has considered Dr. McDermott's report and found that, for the reasons stated herein, her conclusions are suspect, and, in any event, do not establish that petitioner was incompetent to plead guilty in 2002.

(Report at 24 n.11). Although the Magistrate Judge reasoned that the fact that Dr. McDermott's report was authored ten years after the plea agreement undercut the conclusions in the report (see id. at 23-24), in doing so, it was also observed that "Dr. McDermott's opinion is based exclusively on her personal evaluation of petitioner in 2013 and on records generated after petitioner pleaded guilty." (Id. at 23). In other words, Dr. McDermott's opinion was not discounted because it was authored ten years after the plea hearing; rather, it was discounted because it did not represent an accurate assessment of petitioner's intellectual functioning *in 2002* because her opinion was based on *materials and statements* that were generated or made years after petitioner

entered his guilty plea.[2] Cf. Sherwood v. Sherman, 734 F. App'x 471, 474 (9th Cir. 2018) (holding that district court erred in rejecting psychologist's retrospective report regarding petitioner's competency to plead guilty because report "was based wholly on evidence that was readily available to [counsel] at the time of trial").

### 2. The Lack of an Incompetency Finding in Dr. McDermott's Report

Second, petitioner contends that Dr. McDermott's opinion was deemed "irrelevant to the competency question" because Dr. McDermott reached no opinion as to whether petitioner was competent to stand trial in 2002. (Obj. at 13). Specifically, petitioner maintains that, irrespective of whether Dr. McDermott reached a conclusion as to petitioner's competency to plead guilty in 2002, her findings and conclusions regarding petitioner's mental capacities, nevertheless, "clearly bear on his ability to understand legal proceedings." (Id.).

Again, petitioner's argument reflects a misreading of the Report, which at no point reflects a finding that Dr. McDermott's failure to reach an opinion as to petitioner's competency to plead guilty in 2002 rendered her opinion irrelevant. Rather, the Magistrate Judge's reasoning is based on the finding that Dr. McDermott could not accurately assess how petitioner's purported low intellectual functioning impacted his ability to competently plead guilty in 2002 because Dr. McDermott never reviewed any of the evidence contemporaneous with the 2002 plea hearing. In this context, Dr. McDermott reached no opinion as to petitioner's competency to plead guilty in 2002:

> [T]here is no indication in either of her reports that Dr. McDermott ever reviewed the transcripts of the June 2002 plea and sentencing hearings, nor is there any indication that she reviewed the letter that petitioner wrote to the trial court. As such, she could not determine if and how petitioner's purported low intellectual functioning impacted his competency to plead guilty in 2002. Indeed, although Dr. McDermott reached several conclusions about petitioner's intellectual abilities, she did not reach any conclusion as to whether petitioner's intellectual abilities rendered him incompetent to plead guilty in June 2002. Rather, she opined only that petitioner's "low functioning" "may in part explain his poor academic achievement, as well as his poor verbal skills."

---

[2] As explained below, the materials and statements upon which Dr. McDermott's opinion was based was only one of many reasons cited by the Magistrate Judge in determining that Dr. McDermott's opinion was not reliable or illustrative of petitioner's intellectual functioning in 2002. (See infra).

8

(Report at 24 (citation omitted) (concluding that Dr. McDermott's "opinion sheds little, if any, light on whether, in June 2002, petitioner was incompetent to plead guilty.")).

Accordingly, petitioner's objection is not well-taken.[3]

### 3. Petitioner's Malingering

Third, petitioner argues that discounting Dr. McDermott's opinion based on the fact that Dr. McDermott noted petitioner may have been malingering, was error. (Obj. at 14). Specifically, petitioner complains about the statements in the Report that "Dr. McDermott found 'it was likely that [petitioner] was feigning his purported symptoms of mental illness,' and that '[petitioner] demonstrated a lack of effort in performing the relevant tests to determine his intellectual functioning.'" (Id. (citing Report at 25)). According to petitioner, these statements are "wrong on both counts" because "Dr. McDermott offered no definitive opinion on whether [petitioner] was feigning mental illness"; instead, Dr. McDermott recommended that further testing and evaluation was needed to determine if, in fact, petitioner was "feigning his psychiatric symptoms." (Id.). What is more, petitioner suggests that irrespective of whether petitioner was feigning his psychiatric symptoms, Dr. McDermott's conclusion that petitioner was not deliberately feigning cognitive deficits should not have been ignored. (Id.).

To the extent that he contends that the Report inaccurately summarized Dr. McDermott's findings, petitioner is mistaken. On the contrary, in discussing Dr. McDermott's conclusions as to petitioner's intellectual functioning and psychiatric symptoms, Dr. McDermott's conclusions were *quoted*:

> Dr. McDermott's own opinion undercuts her conclusions. For example, she found that it was likely that petitioner was feigning his purported symptoms of mental illness. (See Second Supp'l Opp'n at 15). Although she did not conclude that petitioner was feigning his cognitive deficits, Dr. McDermott repeatedly noted that petitioner demonstrated a lack of effort in performing the relevant tests to determine his intellectual functioning. (See Second Supp'l Opp'n at 16 ("[T]here were both consistencies and inconsistencies in [petitioner's] obtained scores, suggesting that

---

[3] In a separate section of the Report, the lack of an opinion as to petitioner's competency in 2002 was cited as one of many reasons why an evidentiary hearing was not warranted. (See Report at 33). Petitioner raises no objection to that aspect of the Report, although he does object to a different statement pertaining to Dr. McDermott made in that section of the Report. (See infra).

9

> at times he may not have been putting forth adequate effort on some assessments."); id. (noting that petitioner "is functioning overall at a very low level," but conceding that "the measure of receptive language was likely artificially lower due to lack of effort"); id. ("The results of my cognitive testing suggest that although [petitioner] likely was not putting forth adequate effort on some of the assessments, he appears to be functioning in the borderline to extremely low range of intellectual functioning.")).

(Report at 25) (footnote omitted).

There is, likewise, no merit to petitioner's suggestion that Dr. McDermott's conclusion that petitioner was not feigning his cognitive deficits was not acknowledged. In fact, the Report explicitly stated that fact: "*Although she did not conclude that petitioner was feigning his cognitive deficits*, Dr. McDermott repeatedly noted that petitioner demonstrated a lack of effort in performing the relevant tests to determine his *intellectual functioning*." (Id. (emphases added)).

Similarly, Dr. McDermott clearly found that more testing was required to determine if, in fact, petitioner was feigning his symptoms of mental illness. The Report, again, explicitly noted that fact: "*Although Dr. McDermott suggested that further assessment was required on this issue*, there is no indication in the record that Dr. McDermott conducted any further assessment." (Id. at 25 n.12 (emphasis added)).

### 4.     Lack of Factual or Evidentiary Support for Dr. McDermott's Conclusions

Fourth, petitioner faults the Report's conclusion that Dr. McDermott's conclusions as to the duration and impact of petitioner's low level of intellectual functioning had "little factual or evidentiary support." (Obj. at 15).[4] This conclusion, according to petitioner, was "baseless" because "Dr. McDermott's findings regarding [petitioner's] impairments were grounded on his scores on a number of standardized tests measuring intellectual functioning and literacy." (Id. at 16).

This objection is not well-taken for several reasons. First, the portion of the Report that petitioner challenges is not related to the merits of petitioner's competency claim. Rather, the

---

[4] Specifically, petitioner states: "Finally, the Report notes in passing that Dr. McDermott 'concludes, with little factual or evidentiary support, that [petitioner's] low level of intellectual function likely has been present throughout his lifetime and that [petitioner's] low functioning may in part explain his poor academic achievement, as well as his poor verbal skills.'" (Obj. at 15 (citation omitted)).

10

challenged statement appears in the section of the Report discussing whether or not an evidentiary hearing is warranted as to petitioner's grounds for relief. (See Report at 33). By contrast, when analyzing Dr. McDermott's opinion in the section of the Report addressing the merits of petitioner's claims, the Magistrate Judge did not cite a lack of factual or evidentiary support as among the many reasons that he cited in finding that Dr. McDermott's opinion was insufficient to show that petitioner was incompetent to plead guilty in June of 2002.[5]

Additionally, the findings in the Report regarding whether an evidentiary hearing was warranted did not rely primarily on the lack of evidentiary or factual support for Dr. McDermott's opinion and conclusions; instead, the lack of evidentiary or factual support was cited only to illuminate the point that Dr. McDermott never opined as to whether petitioner was incompetent to stand trial:

> Second, unlike Sherwood, no medical expert has opined that petitioner was incompetent to stand trial or plead guilty in June 2002. Instead, Dr. McDermott opined only that petitioner, in 2002, operated at an extremely low level of intellectual functioning. Putting aside the many reasons why that opinion is suspect (see supra), Dr. McDermott's conclusions stand in stark contrast to the conclusion offered by the psychologist in Sherwood, who explicitly opined that the petitioner in Sherwood was incompetent when he pleaded guilty. Indeed, Dr. McDermott offers no opinion on petitioner's competency in June 2002, or at any other time. Instead, she simply concludes, with little factual or evidentiary support, that petitioner's low level of intellectual function likely has been present throughout his lifetime and that petitioner's "low functioning" "may in part explain his poor academic achievement, as well as his poor verbal skills."

(Report at 33 (citing Docket No. 60-1 at 1)). As the foregoing language makes clear, the primary point of this discussion in which the challenged statement appears was simply to contrast Dr. McDermott's opinion with the opinion of the psychiatrist in Sherwood. Consequently, even

---

[5] To be sure, the Magistrate Judge observed that Dr. McDermott's failure to review any of the evidence contemporaneous with the June of 2002 guilty plea undercut the value of her opinion. (See Report at 24). However, petitioner's objection, here, does not pertain to that observation. Instead, petitioner directs his objection to the Magistrate Judge's statement about Dr. McDermott's conclusion that petitioner's low level of intellectual function likely has been present throughout his lifetime and that his low functioning may in part explain his poor academic achievement, as well as his poor verbal skills. (See supra).

assuming that the Magistrate Judge erred, it would make little to no difference to the analysis as to whether an evidentiary hearing is warranted.

Second, the record supports the challenged statement. As is clear from her assessment of petitioner, Dr. McDermott primarily based her opinion and conclusions on petitioner's own reporting and the results of intellectual assessments that Dr. McDermott conducted on petitioner in 2013. (See Docket No. 41 at 13-15). Indeed, petitioner concedes that fact. (See Obj. at 16 ("Dr. McDermott's findings regarding [petitioner's] impairments were grounded on his scores on a number of standardized tests measuring intellectual functioning and literacy.")). But, as Dr. McDermott herself noted, the results of those tests were questionable because there was evidence indicating that petitioner was not putting forth adequate effort on some of the assessments.[6] These observations, at a minimum, call into question the factual and evidentiary support for Dr. McDermott's conclusions as to petitioner's intellectual functioning. Moreover, in her subsequent declaration, Dr. McDermott simply relied on her cognitive assessments of petitioner to draw conclusions about the duration of petitioner's low level of intellectual functioning, as well as how it explained his poor academic performance and verbal skills. (See Docket No. 60-1 at 1). But as explained above, the cognitive assessments on which she relied were, at a minimum, suspect. In any event, although the cognitive tests that Dr. McDermott conducted in 2013 may be relevant to petitioner's intellectual functioning at the time the tests were conducted, it is, to say the least, somewhat speculative to conclude, as Dr. McDermott did, that petitioner operated at the same low intellectual functioning "throughout his whole life." Indeed, the

---

[6] (See, e.g., Obj. at 16 (noting petitioner's "extremely low" intelligence, but stating that "there were both consistencies and inconsistencies in [petitioner's] obtained scores, suggesting that at times he may not have been putting forth adequate effort on some assessments."); id. (noting that petitioner "is functioning overall at a very low level," but conceding that "the measure of receptive language was likely artificially lower due to lack of effort"); id. ("The results of my cognitive testing suggest that although [petitioner] likely was not putting forth adequate effort on some of the assessments, he appears to be functioning in the borderline to extremely low range of intellectual functioning.")).

speculative nature of this conclusion is punctuated by the fact that Dr. McDermott did not review any of petitioner's medical files pre-dating 2004.[7]

## CONCLUSION

Based on the foregoing and pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, the other records on file herein, the Magistrate Judge's Report and Recommendation, and petitioner's Objections to the Report and Recommendation. The Court has engaged in a de novo review of those portions of the Report and Recommendation to which objections have been made. The Court concurs with and accepts the findings and conclusions of the Magistrate Judge, with the following modification, see 28 U.S.C. § 636(b)(1)(C), which is not material to the Court's decision:

At page 12, line 26, after "(citation omitted)." insert the following:

> Notwithstanding that the Court is reviewing petitioner's grounds for relief under the de novo standard of review, the Court, alternatively, finds, for the reasons stated herein, that the California Court of Appeal's rejection of petitioner's grounds for relief was neither an unreasonable application of, nor contrary to, clearly established federal law as determined by the Supreme Court, assuming AEDPA deference is owed to the California Court of Appeal's opinion. (See Respondent's Lodgment No. 6).

ACCORDINGLY, IT IS ORDERED:

1. The Report and Recommendation is accepted, as modified.

2. Judgment shall be entered consistent with this Order.

3. The clerk shall serve this Order and the Judgment on all counsel or parties of record.

DATED: June 17, 2020

                                                  GEORGE H. WU
                                                  UNITED STATES DISTRICT JUDGE

---

[7] Petitioner also complains that "Dr. McDermott's evaluation [was rejected] because she concluded [that] '[petitioner] did not meet the [diagnostic] criteria for an intellectual disability diagnosis.'" (Obj. at 14 (citing Report at 25)). This argument is meritless. Although Dr. McDermott concluded that petitioner did not meet the diagnostic criteria for an intellectual disability diagnosis, there is no indication in the Report that Dr. McDermott's evaluation was rejected based on that fact.